## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHOICE GATEWAY II, LLC, and
SUVARNA, LLC,

                  Plaintiffs,

v.

CIG CAPITAL LLC a/k/a CIG CAP, LLC,
CHARLES D. CAREY and JOSHUA LEU,

                  Defendants.

Case No. _____

Hon. _____

Magistrate Judge _____

---

## **COMPLAINT**

Plaintiffs Choice Gateway II, LLC, and Suvarna, LLC, for their Complaint against CIG Capital, LLC (a/k/a CIG Cap), Charles D. Carey and Joshua Leu, state the following:

### Nature of Action

1. This case centers around a lending scam whereby Defendants induced Plaintiffs to provide $14.75 million in "collateral" (through a standby letter of credit) as security for a $95 million loan, subsequently advanced only $4.5 million of the $95 million loan, and then drew on the entire $14.75 letter of credit – based on a purported contractual breach – to effectively convert $10.25 million of specifically identifiable funds. Defendants' fraudulent conduct was part of an orchestrated scheme that violated, *inter alia*, MCL 600.2919a, thereby entitling Plaintiffs to treble damages of at least $30.75 million. Plaintiffs bring this action to recover compensatory damages, treble damages, exemplary damages, attorney's fees, and costs.

### Parties

2. Plaintiff Choice Gateway is a Delaware limited liability company with its principal place of business in Georgia. All members of Choice Gateway are citizens of Georgia. Choice Gateway is the sole manager of Plaintiff Suvarna.

3.      Plaintiff Suvarna is a Delaware limited liability company with its principal place of business in Georgia. The sole member of Suvarna is a Delaware limited liability company with its principal place of business in Georgia.

4.      Defendant CIG Capital LLC ("CIG Capital")  (a) was originally organized as a Michigan limited liability company with its principal place of business and registered office in Lansing, Michigan (b) operated as Michigan limited liability company with its principal place of business in Lansing, Michigan during the underlying events giving rise to this action (c) transacts business within Michigan, and (d) has done or caused acts to be done, or consequences to occur, in Michigan resulting in tort actions below. Upon information and belief, (a) CIG Capital later converted to a Florida limited liability company and maintains a registered office in Windemere, Florida, (b) CIG Capital continues to transact business and maintain a registered office in Michigan, and (c) none of the members of CIG Capital are citizens of Delaware and/or Georgia.

5.      Upon information and belief, Defendant Charles D. Carey ("Carey") (a) is a citizen of Michigan and/or Florida residing in Lansing, Michigan and/or Windemere, Florida, (b) is a member of CIG Capital, (c) transacts business within Michigan, and (d) has done or caused acts to be done, or consequences to occur, in Michigan resulting in tort actions below.

6.      Upon information and belief, Defendant Joshua Leu ("Leu") (a) is a citizen of Michigan residing in Portland, Michigan, (b) is an officer of CIG Capital, (c) transacts business within Michigan, and (d) has done or caused acts to be done, or consequences to occur, in Michigan resulting in tort actions below.

**Jurisdiction and Venue**

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as this action is wholly between citizens of different states and the amount in controversy is greater than $75,000.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b), and this Court has personal jurisdiction over the Defendants, because a substantial part of the events or omissions giving rise to the claims occurred in this district and this Court otherwise has personal jurisdiction over Defendants.

### Background Facts

9.      On behalf of himself and other investors, Vilas Patel ("Patel") owns, develops, and manages hotels in and around metro Atlanta, Georgia, including a hotel near Atlanta's Hartsfield-Jackson International Airport, the AC Hotel by Marriott Atlanta Airport Gateway.

10.     After the above hotel was financed and under construction, Mr. Patel turned his attention to a second hotel development nearby – a new Sheraton Hartsfield Jackson Airport Hotel (the "Sheraton Hotel"). Sheraton is another brand owned by Marriott.

11.     While exploring financing options in early 2019 to secure the approximately $95 million in funding needed to construct this new Sheraton Hotel, Mr. Patel learned of CIG Capital, a purported lender offering to provide all of the required financing.

12.     On January 13, 2019, CIG Capital arranged for Attorney John T. Tait in San Clemente, California to issue a letter to Suvarna in Atlanta, Georgia verifying that CIG Capital (a) was "a credible Lender with sufficient financing capacity," (b) "through its source of funds, [had] the capacity to settle and follow the closing procedures to provide a Loan in excess of $95,000,000.00 USD," and (c) had "completed in excess of 300 loan transactions."

13.     Mr. Patel's primary contacts at CIG Capital were Mr. Carey, (founder, Chairman, and managing member of CIG Capital) and Mr. Leu, (loan underwriting director of CIG Capital).

14.     After Mr. Patel began discussing financing the Sheraton Hotel project through CIG Capital with both Mr. Carey and Mr. Leu by the spring of 2019, both Mr. Carey and Mr. Leu

repeatedly represented – through phones calls, text messages, and e-mails described in more detail below – that they could provide the financing necessary to construct the Sheraton Hotel project.

15.    At this time, CIG Capital also made the following representations on its website under the headings "What We Do" and "Who We Are" respectively:

> CIG Capital is a project finance firm focused on providing 100% funding for large projects worldwide. As a project funder, CIG Capital takes a more creative and custom approach than a traditional funder. With a diversified portfolio and not one industry-specific type of financing, CIG Capital offers a unique competitive advantage by working with many industries such as renewables, utilities, fintech, technology, biomedical, software, infrastructure, alternative energy, real estate projects, and many more.
>
> * * * * * * * *
>
> After funding the CIG Capital Management Team provides all of the services from start to finish for every project. CIG Capital does more than just fund projects; we are here to make sure they achieve success. That's why we partner with projects and become co-developers.  CIG Capital works closely with each project to help in the main areas where projects fail. Most funding groups do not focus on fully supporting the project, only the funding aspects. This is what separates CIG Capital. Charles D. Carey believes it is important to focus on supporting the project's success to de-risk the funding.

*See* https://www.cigcap.com/about/ (these representations were still reflected on the website at least as of December 19, 2023). Mr. Patel reasonably relied on these representations, and others, on CIG Capital's website while conducting his own due diligence about CIG Capital.

16.    In sum, Defendants represented to Plaintiffs that they were capable of funding a $95 million loan for construction financing of the new Sheraton Hotel and the management team at CIG Capital specialized in originating and making business loans of that type and magnitude.

17.    Based on these representations, Suvarna entered into a "Loan Agreement" ("First Loan Agreement") and "Collateral Security Agreement" with CIG Capital on July 26, 2019. Upon information and belief, a copy of the First Loan Agreement and Collateral Security Agreement are in Defendants' possession. Based on these representations, Choice Gateway also entered into an "Interest Pledge Agreement" with, and issued a Promissory Note to, CIG Capital on July 26, 2019.

Upon information and belief, a copy of the Interest Pledge Agreement and Promissory Note are in Defendants' possession. (The First Loan Agreement, Collateral Security Agreement, Interest Pledge Agreement and Promissory Note are collectively referred to herein as the "First Set of Loan Documents"). Section 12 of the First Loan Agreement provides in part:

> (a)     Each of the parties hereto hereby submits, for itself and its property, to the nonexclusive jurisdiction of any Michigan state court or federal court of the United States of America, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in such Michigan state court or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted by law.

> (b)     Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement or other Loan Documents in any such Michigan state or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of inconvenient forum to the maintenance of any such action or proceeding in any court.

18.     In the First Loan Agreement, Lender CIG Capital "agreed to loan Borrower up to Ninety-Five Million and No/100 US Dollars ($95,000,000.00 USD) (the "Loan") pursuant to Advances described in a Tranche Schedule attached as Schedule 1." (First Loan Agreement, Recital D). The "Tranche Funding Schedule" attached as Schedule 1 provided for CIG Capital loaning the total $95 million to Suvarna in established tranches ranging between $1 million and $14.25 million over a 30-month disbursement schedule. (*Id*. at Schedule 1).

19.     Recital E to the First Loan Agreement also provided:

> Lender and Borrower acknowledge that any monies required to fund the Loan or to make the Advances described in Tranche Schedule are being made to Lender pursuant to a separate funding commitment from an outside family wealth office or hedge fund ("*Funding Source*") and such Loan and any Advances are contingent upon completion of the funding commitment from the Funding Source.

Lender will confirm in writing when the funding commitment is in place at which point such contingency shall end and from and after such confirmation Lender will have an absolute obligation to make fund the Loan and make the Advances provided that Borrower in compliance with the terms of the Loan Document.

20.     Section 3(a) of the First Loan Agreement also provided:

Borrower shall have demonstrated to Lender's reasonable satisfaction that Borrower has designated Lender as primary beneficiary to Collateral [in the form of a Standby Letter of Credit] in the amount of Fourteen Million Seven Hundred Fifty Thousand and No/100 US Dollars ($14,750,000.00 USD) ("*Collateral Amount*") in accordance with the Collateral Security Agreement to be executed by the Borrower in favor of the Lender (the "Collateral Security Agreement"). The Collateral will remain with [Custodian] Explus Corporation Co., Ltd … and such Collateral shall automatically be released and returned to Borrower upon the occurrence of a Lender Default, but shall otherwise be held and applied to secure repayment of the Loan at such time as the Loan is fully advanced.

21.     The First Loan Agreement also provided in part: "In the event Lender defaults under this Loan Agreement, then in addition to any other remedies that Borrower may have, Borrower may immediately withdraw the Collateral." (First Loan Agreement at § 4(b)). Recognizing the Borrower's immediate need for financing, the First Loan Agreement also provided: "Time is of the essence of this Agreement." ( *Id.* at § 10).

22.     Recognizing that the Collateral in the form of the $14.75 million Standby Letter of Credit ("LOC") was intended to serve solely as security for the advanced loan, the Collateral Security Agreement provided in pertinent part:

"Payment Default" means if Borrower fails to make required, on time, payments throughout the term of the Loan Agreement. [§ 1.7].

* * * * * * * *

Lender will not call or draw upon the Collateral [the LOC] unless Borrower is in Payment Default as defined in Paragraph 1.7 of this Agreement and has not cured the default. [§ 1.7].

* * * * * * * *

Except for the event of Payment Default as defined in Paragraph 1.7, Lender will not put the Collateral [LOC] at risk of being depleted or drawn upon from any outside investment(s) or transaction(s). Lender shall not draw upon or otherwise deplete the Collateral [LOC]. [§ 5.9].

\* \* \* \* \* \* \* \*

Notwithstanding any provision to the contrary, Lender shall not take the actions set forth in this section 8 unless and until Lender suffers an out of pocket loss and then such action by Lender pursuant to the terms hereof shall be only for the amount of the out of pocket loss experienced by Lender as a result of any uncured default by Borrower. Any draw by Lender on the Collateral delivered hereby by Borrower must be accompanied by a *Certification from an officer of Lender, under penalty of perjury,* that Lender has experienced an out of pocket loss and the amount of said loss as of the date of said certification… (a) Where Collateral means Stand By Letter of Credit held by Custodian on behalf of Lender and Borrower, the abovementioned said Certification shall be delivered to Custodian and Borrower pursuant to the provisions of paragraph 9.1 hereof. [§ 8.4].

(Collateral Security Agreement at §§ 1.7, 5.8, 5.9, and 8.4 respectively (emphasis added)).

23.    On August 1, 2019, Mr. Patel finalized documentation to obtain the LOC from Bank of America which required, among other things, Choice Gateway to deposit $14.75 million in cash with Bank of America. Shortly thereafter, on August 30, Mr. Patel wrote CIG Capital to confirm that "all due diligence items [are] met and approved by CIG . . . and that Suvarna LLC has met all loan conditions."

24.    The same day, on August 30, 2019, Mr. Leu sent Mr. Patel an e-mail confirming that Suvarna had in fact met all prerequisites to funding under the Parties' First Loan Agreement and associated loan documents, which provided in pertinent part:

Yes, I can confirm Luke's last notification, as stated below…. As a follow-up to a conference call completed earlier this week, this Email confirms that the Sheraton Hartsfield-Jackson Airport Project (Reference Number 0004547) has met all CIG Capital documentation requirements (and has been approved) for Risk Management pre-closing and *is approved to proceed to final closing*. In addition, the loan documents will govern any default scenarios. As we stated verbally and now in this email, we have no intention of calling the instrument [the LOC].

25.    Despite the fact CIG Capital had confirmed that Suvarna had met all prerequisites to the Loan Agreement and was "approved to proceed to final closing" (thereby confirming the funding commitment from the Funding Source was in place), CIG Capital never had any intention of providing the requisite $95 million loan as evidenced by its failure to provide Suvarna with any

funding under the Tranche Schedule, which required $1 million in funding by "Month 1." While CIG was contractually required to have advanced $6 million by Month 3 (Day 90), CIG Capital failed to advance Suvarna any funds in September, October, or November of 2019.

26.    Instead, as part of Defendants' fraudulent scheme, Mr. Carey asked Plaintiffs to change the Custodian for the LOC. Shortly after this request, on November 26, 2019, on behalf of CIG Capital, Mr. Leu sent Suvarna a letter to "serve as confirmation of the Lender's commitment to loan to the Borrower Ninety-Five Million US Dollars ($95,000,000.00 USD)" (thereby again confirming the funding commitment from the Funding Source was in place).

27.    After cancelling the first LOC at Defendants' request, on January 21, 2020, again at Defendants' request, Mr. Patel obtained a second LOC for Custodian beneficiary "BOKF, N.A., Trustee" at "Bank of Oklahoma, N.A." with a scheduled expiration date of January 21, 2021, again through Bank of America. This second LOC through Bank of America continued to be backed by Choice Gateway's $14.75 million cash deposit with Bank of America.

28.    When CIG Capital still failed to advance any funds over the following months, Mr. Carey offered assuring representations, some of which are detailed in the text messages referenced below, about the timing and status of the first advance to Suvarna. Generally, Mr. Carey represented that the funds would be coming in short order. For example, on March 18, 2020, Mr. Carey texted Mr. Patel to falsely represent that the funding would be ready "tomorrow…funds right after" and that "it's [the funding] happening."

29.    On March 19, 2020, Mr. Carey texted Mr. Patel to falsely represent that it was not a matter of "if" the funding goes through but rather: "it's about when!"

30.    When Mr. Patel texted Mr. Carey on March 26, 2020, to advise that he may need to cancel the second LOC so that he could secure financing from another lender, Mr. Carey issued

the following false representation later that day: "What the heck is wrong with you? We are literally finishing this thing up in this crazy market …. we are closing." Later that same day, Mr. Carey falsely represented: "[W]e will wrap this up tomorrow" and "I'll have our closing finally."

31.    The same day, March 26, 2020, Mr. Carey also texted Mr. Patel to represent that CIG Capital had financed "12 Term Sheets over 2.7B this last two weeks" to further induce Mr. Patel to believe that the funding would actually come through and not cancel the second LOC.

32.    On March 27, 2020, Mr. Carey texted Mr. Patel to falsely represent he had "12M" (i.e., *$12 million*) in financing lined up and was "expecting the rest today" (i.e., the remaining $83 million). Later that day, Mr. Carey again texted Mr. Patel falsely representing that CIG Capital "wrapped up [the financing] today" and that he was going to get "clarity on when funds are transferred" for the loan. Mr. Carey further falsely represented to Mr. Patel that he would have all the money for the construction loan by the following Wednesday or Thursday.

33.    After Mr. Patel texted Mr. Carey congratulatory remarks, Mr. Carey responded later by stating he had told Mr. Patel's partner about "the good news" about when the funds would be arriving. However, on March 30, 2020, Mr. Carey texted Mr. Patel to falsely represent that he would have "cash by Thursday" for Plaintiffs' loan.

34.    On April 2, 2020, Mr. Carey texted Mr. Patel to falsely represent that there would be "April 2nd disbursements."

35.    By April 2, 2020, more than 7 months had passed since CIG Capital had advised Suvarna that it was "*approved to proceed to final closing*" (and thus, CIG Capital should have already advanced $11 million in funding under the Tranche Funding Schedule).

36.    However, on April 2, 2020, at CIG Capital's request (after Mr. Carey's repeated representations that significantly more funding was available), Suvarna signed a one-page

"Addendum to Schedule 1, Tranche Funding Schedule Loan" (the "Addendum"). (Upon information and belief,  a copy of the Addendum is in Defendants' possession). The Addendum provided for the immediate advance of $4.5 million in "Month 1" and that the "remaining tranche funding schedule of [$95 million was] to be determined." The Addendum contained no releases, waivers, or disclaimers. (*Id.*)

37.     On April 6, 2020, CIG Capital advanced Suvarna $4.5 million. This was the one and only sum of money that CIG Capital ever advanced to Suvarna. Based on Mr. Carey's many representations over the previous months and the alteration of the Tranche Funding Schedule, Plaintiffs reasonably expected additional advances to be promptly provided (especially since the second LOC for $14.75 had been secured for over three months).

38.     At approximately this time, Defendants publicly represented through multiple press releases and news outlets that they were capable of, and in the process of, funding the full $95 million Sheraton Hotel loan. *See, e.g.*, YPR NEWSWIRE, *CIG Capital Continues Funding During COVID-19 Crisis*, April 7, 2020 ("CIG Capital has continued to fund and just provided the needed draw for the $90.5 million funding for the Sheraton Hotel in Atlanta, GA, when other lenders have stopped funding").

39.     In light of the above, Mr. Patel repeatedly asked Mr. Carey and Mr. Leu for updates regarding the status of the remaining loan funds. However, obfuscation and excuses from CIG Capital continued over the next six months as detailed below. Generally, Mr. Carey repeatedly represented that the funding (money) was right around the corner.

40.     For example, on June 29, 2020, Mr. Carey texted Mr. Patel to falsely represent that he was "close on [his] side" to securing the next tranches of funding.

41.     On August 13, 2020, Mr. Carey texted Mr. Patel to falsely represent that "we are expecting [it] [funding] right away still."

42.     On August 18, 2020, Mr. Carey texted Mr. Patel to falsely represent that he was "[e]xpecting confirmation of security any day now…"

43.     On August 21, 2020, Mr. Carey texted Mr. Patel to falsely advise Mr. Patel that Suvarna should expect funding on "Monday/Tuesday."

44.     On September 4, 2020, Mr. Carey texted Mr. Patel to advise that funding was no longer going to come through but that he had other strong deals as a source of funding for Plaintiffs. The same day, Mr. Carey texted Mr. Patel that he should not worry as Mr. Carey had his "back like I said." Mr. Carey further represented that he had just closed a "contract for $550 million."

45.     After Mr. Patel inquired about terminating the second LOC due to CIG Capital's failure to fund the remaining loan obligation, Mr. Carey texted Mr. Patel on October 19, 2020, to falsely represent that he would have the funding "this week."

46.     During this period, Mr. Patel repeatedly impressed upon both Mr. Carey and Mr. Leu the importance of receiving the remaining funding to pay Suvarna's general contractors, subcontractors, and others in connection with the Sheraton Hotel's development and construction. Indeed, Suvarna was losing money on holding costs and lost profits from a delayed hotel opening.

47.     Having failed to receive *any* additional funding by October 21, 2020 – more than six months since receiving the sole $4.5 million advance from CIG Capital and 15 months after signing the First Loan Agreement – Mr.  Patel contacted by Bank of America hoping to cancel the second LOC due to CIG Capital's failure or inability to provide the $95 million in funding. Despite this effort, Mr. Patel failed to terminate, amend, or modify the second LOC in any way.

48.     To induce Plaintiffs to refrain from taking any further action to terminate the second LOC despite their failure to provide any additional funding, Mr. Carey continued to make false representations that the remaining funding would soon be forthcoming.

49.     On November 3, 2020, Mr. Carey texted Mr. Patel to falsely represent that "we have the collateral" and that Mr. Carey would know by Thursday the exact date of funding.

50.     On November 12, 2020, Mr. Carey texted Mr. Patel to falsely represent that the funding would be done "tomorrow morning."

51.     Meanwhile, on November 13, 2020, the CIG Capital "Legal Department" sent an unsigned letter to Suvarna stating Suvarna was in default under the First Loan Agreement and Addendum to Schedule 1. The letter stated CIG Capital Mr. Patel's "attempt to terminate" the second LOC constituted a breach of the Loan Agreement and that such action "violate[d] multiple sections of the Loan Agreement, re-sulting [sic] in Default and the Loan due in full." (Upon information and belief,  a copy of the letter is in Defendants' possession). The letter failed to cite any section to support these allegations and notably failed to cite any "Payment Default" by Suvarna, (i.e., the only type of default that would allow for a draw on the second LOC limited to any "out of pocket loss").

52.     The letter also stated CIG Capital "understands the Borrower's actions may not have been absolutely intentional in causing Default" and that it was "working with the Borrower to get the Loan out of Default." (*Id*.) The letter then purported to attach "a non-binding projected Tranche Schedule if and-or when *additional collateral* is provided." (*Id*. (emphasis added)). In other words, despite already having $14.75 million in Collateral to secure a (then) $4.5 million loan, CIG Capital appeared to be "setting up" Plaintiffs to provide even more "collateral."

53.     Subsequent to the issuance of this letter, Mr. Carey and Mr. Leu assured Mr. Patel that they were ready, willing, and able to fund the Sheraton Hotel project but now wanted Plaintiffs to execute new contracts in advance of additional funding.

54.     On November 24, 2020, Mr. Carey texted Mr. Patel to falsely advise that the "funds are coming 2-3 days" and he forwarded a screenshot to Mr. Patel purporting to show a message from a third-party to show that the funds were in fact going to be coming within 2 hours.

55.     On December 2, Mr. Carey texted Mr. Patel to falsely advise that a "wire [transfer was] initiated …," insinuating that funding had been completed and advances were coming.

56.     On December 14, 2020, Mr. Carey texted Mr. Patel a DHL screenshot showing hard copies of funding documents that CIG Capital had arranged for Plaintiffs had arrived.

57.     Meanwhile, shortly before the second LOC was set to expire, CIG Capital surreptitiously and without warning drew the entire $14.75 million second LOC from Bank of America in one day despite the fact that (a) there had never been any "Payment Default" under the First Loan Agreement (consistent with the November 13, 2020 letter from "Legal at CIG Capital") and (b) CIG Capital had only advanced Suvarna $4.5 million in funds. Although Mr. Patel subsequently demanded the return of the converted funds, Defendants refused to return any of these specifically identifiable, converted proceeds.

58.     To date, CIG Capital has failed to provide Plaintiffs with the requisite "Certification from an officer of [CIG Capital], under penalty of perjury, [attesting that it] … experienced an out of pocket loss and the amount of said loss as of the date of said certification." (See Collateral Security Agreement at § 8).

59.     Fearing that these specifically identifiable funds had been converted forever, Mr. Patel agreed under duress to execute new loan documents quickly presented by Defendants after

they had converted $10.25 million in excess of any purported "out of pocket loss."

60.     On January 22, 2021, Suvarna and CIG Capital entered into a new (a) Loan Agreement (the "Second Loan Agreement"), (b) "Interest Pledge Agreement," and (3) "Promissory Note." (This Second Loan Agreement, Interest Pledge Agreement, and Promissory Note are collectively referred to as the "Second Set of Loan Documents"). (Upon information and belief,  a copy of the Second Loan Agreement, Interest Pledge Agreement, and Promissory Note are in Defendants' possession). Like the First Loan Agreement, Section 12 of the Second Loan Agreement contained the same forum selection clause.

61.     In the Second Loan Agreement, Lender CIG Capital "agreed to loan Borrower up to Eighty Million Two Hundred Fifty Thousand and No/100 US Dollars ($80,250,000.00 USD) ("*Loan*") pursuant to Advances described in a Tranche Funding Schedule attached as <u>Schedule 1</u>." (Second Loan Agreement at Recital D). However, the "Tranche Funding Schedule" attached as Schedule 1 provided for CIG Capital loaning a total $88,282,812.50 to Suvarna in tranches ranging between $11 million and $16,050,000 over a 16-month disbursement schedule. (*Id*. at Schedule 1).

62.     Although Schedule 1 purported to provide Suvarna with "Total Funding" of $95 million (which included "$14,750,000.00 [of] Borrower Equity"), Schedule 1 deducted the following amounts from the First Advance of $17,717,187.50 in Month 1 (to provide only for a net advance of $11 million): $2,006,250 in loan fees; $210,937.50 in "outstanding interest"; and the $4.5 million previously advanced, (i.e., total $6,717,187.50).  In addition, the Second Loan Agreement purported to charge Suvarna another $1,203,750.00 "as underwriting and risk fees" to also be paid at the closing date. (*Id*. at Definitions, p. 19). In other words, CIG Capital effectively agreed to loan Suvarna the $10.25 million it had stolen from Plaintiffs (after deducing another

$453,750) in the first month (thereby charging Suvarna interest on its own money).

63.     The Second Loan Agreement falsely represented that the "Loan is being funded from secured notes issued by Financial Consulting Services Group" though, to date, CIG Capital has failed to provide Plaintiffs with any evidence of these "secured notes."

64.     The Second Loan Agreement also provided: "Borrower and Lender understand and agree that this Agreement becomes binding on both parties after the Closing Date has occurred." (*Id*. at Recital A). "Closing Date" was defined as "when the First Advance is advanced by Lender." (*Id*. at Definitions, p. 18). "First Advance" was defined as having "the meaning set forth in <u>Schedule 1</u>." (*Id*. at Definitions, p. 19). Again, Schedule 1 provided for the First Advance of (net) $11 million in Month 1. (*Id*. at Schedule 1). Schedule 1 also provided: (a) "tentative and non-binding until closing date has occurred" and (b) "all advances made at discretion of lender." (*Id*.)

65.     Despite the fact that $10.25 million of the first (net) advance of $11 million (before "underwriting and risk fees") was to be funded with Plaintiffs' own money, CIG Capital failed to provide any financing to Suvarna pursuant to the Second Loan Agreement (including even the stolen $10.25 million). Consequently, the Second Set of Loan Documents executed by Mr. Patel under duress never became binding. (See *id.* at Recital A).

66.     After January 22, 2021, Mr. Carey continued to falsely represent that CIG Capital could and would fully fund the Sheraton Hotel project by representing that: (a) CIG Capital had funding nearly ready to go and would have cash for Suvarna's funding soon; (b) CIG Capital was delayed as the result of unspecified "compliance" issues; and (c) CIG Capital was still committed to fully funding the Sheraton Hotel Project.

67.     On January 25, 2021, Mr. Carey texted Mr. Patel to falsely represent "Desk confirmed closing Jan. 28th" with respect to all funds needed to finance Plaintiffs' loans.

68.     After texting to advise "we had compliance issues …" as a reason for funding not coming through earlier in the month, Mr. Carey texted Mr. Patel on February 26, 2021, to falsely represent that it would be "6-10 days cash in hand."

69.     When funding failed to come through and Mr. Patel repeatedly asked what happened to the $14.75 million that CIG Capital took through its draw on the second LOC (including the $10.25 million above the $4.5 million advanced), Mr. Carey repeatedly failed to provide any meaningful or substantive response.

70.     On June 29, 2021, during a telephone conference between Mr. Carey, Mr. Leu, and Mr. Patel, Mr. Carey attempted to persuade Mr. Patel and Suvarna to sign a third set of loan documents for a new "product" and funding source that Mr. Carey contended could serve as a funding source for the Sheraton Hotel project. However, Mr. Carey never explained why CIG Capital was unable to fund the loan through the "secured notes issued by Financial Consulting Services Group" (as represented in the Second Loan Agreement). During this conference, Mr. Carey and Mr. Leu represented that they had performed financing for 10 hotels, blamed financing delays on COVID-19, and again represented the Sheraton Hotel project would be fully funded.

71.     Although it had been over 30 months since the signing of the First Loan Agreement, (i.e., longer than the original Tranche Funding Schedule), Suvarna had only received $4.5 million (of the promised $95 million) in financing while having $10.25 million of its own funds stolen. In short, Suvarna and Choice Gateway had suffered a minimum $10.25 million loss associated with CIG Capital's conversion of the $14.75 million draw against the second LOC.

72.     Indeed, along with the above minimum damages, Suvarna and Choice Gateway have suffered additional damages, including but not limited to: (a) increased construction costs, increased labor costs, costs to remobilize and re-prepare site for construction, increased carrying

costs, reputational damage, and lost revenue and profits all due to the financing delay; (b) design fees due to Marriott; and (c) damages associated with foregoing other lending opportunities.

## COUNT I – FRAUD AGAINST CIG CAPITAL AND MR. CAREY

73.     Plaintiffs hereby incorporate each allegation above as if fully set forth herein.

74.     Before execution, within, and after execution of the First Set of Loan Documents, Mr. Carey and CIG Capital represented CIG Capital had the ability to, and would, loan Suvarna $95 million for the Sheraton Hotel project.

75.     Plaintiffs also relied upon representations on CIG Capital's website that, among other things, Defendants were experienced and viable lenders for projects like the Sheraton Hotel.

76.     After the execution of the First Set of Loan Documents, Mr. Carey repeatedly represented by phone, e-mail and text messages that CIG Capital had the ability to, and would, finance the Sheraton Hotel project. Indeed, Mr. Carey repeatedly represented funding for the Sheraton Hotel project was on the cusp of being finalized, including the specific examples cited at Paragraphs 28 through 34 above. Indeed, at certain times throughout the relationship, Mr. Carey and Mr. Patel had daily text message contact about the status of the loan.

77.     At the time CIG Capital and Mr. Carey made these material representations, they knew these representations were false or alternatively, made them recklessly without any knowledge of their truth and as positive assertions. Further, these representations were made in bad faith without any present intention to perform and used as a device to perpetrate a fraud, (including inducing Plaintiffs to provide collateral in excess of advanced funds so that they could effectively convert the entirety of the collateral pursuant to their lending scam).

78.     Plaintiffs relied on these material representations by, among other things, refraining from seeking alternative financing, executing the First Set of Loan Documents, taking out the

original and second LOC, failing to cancel the second LOC prior to the Addendum, and executing the Addendum.

79.    After the execution of the Addendum, Mr. Carey continued to repeatedly represent that funding for the Sheraton Hotel project was on the cusp of being finalized, including the specific examples cited at Paragraphs 40 through 45, above. After Mr. Patel attempted to cancel the second LOC, Mr. Carey continued to represent that funding for the Sheraton Hotel project was on the cusp of being finalized, including the specific examples cited between cited at Paragraphs 49 through 50 and Paragraphs 54 through 56 above.

80.    At the time Mr. Carey and CIG Capital made these material representations, they knew these representations were false or alternatively, made them recklessly without any knowledge of their truth and as positive assertions. Further, these representations were made in bad faith without any present intention to perform and used as a device to perpetrate a fraud (including inducing Plaintiffs to provide collateral in excess of advanced funds so that they could effectively convert the entirety of the collateral pursuant to their lending scam).

81.    Plaintiffs relied on these material representations by, among other things, continuing to refrain from seeking alternative financing and continuing to refrain from taking further action to cancel the second LOC. Indeed, the last communications by Mr. Carey appear to have been designed to induce Plaintiffs to maintain the second LOC long enough for Defendants to withdraw $14.75 million (despite having advanced only $4.5 million) before the LOC expired.

82.    As a result of their reliance on the material misrepresentations by Mr. Carey and CIG Capital, Plaintiffs have suffered damages including but not limited to the above referenced $10.25 million (above the $4.5 million advanced), along with additional damages including those detailed in Paragraph 72 above. Given that these Defendants acted improperly, intentionally, and

with malice, Plaintiffs are also entitled to exemplary damages.

## COUNT II – FRAUD AGAINST CIG CAPITAL AND MR. LEU

83.    Plaintiffs hereby incorporate each allegation above as if fully set forth herein.

84.    In the First Set of Loan Documents, CIG Capital and Joshua Leu represented to Plaintiffs that CIG Capital had the ability to, and would in fact, lend Suvarna $95 million for the Sheraton Hotel project with the intention that Plaintiffs would rely on these representations.

85.    Plaintiffs also relied upon representations on CIG Capital's website that, among other things, Defendants were experienced and viable lenders for projects like the Sheraton Hotel.

86.    At the time CIG Capital and Mr. Leu made these material representations, they knew these representations were false or alternatively, made them recklessly without any knowledge of their truth and as positive assertions. Further, these representations were made in bad faith without any present intention to perform and used as a device to perpetrate a fraud (including inducing Plaintiffs to provide collateral in excess of advanced funds so that they could effectively convert the entirety of the collateral pursuant to their lending scam).

87.    Plaintiffs relied on these material representations by, among other things, executing the First Set of Loan Documents, refraining from seeking alternative financing, and taking out the original LOC.

88.    On August 30, 2019, Mr. Leu sent Mr. Patel the above referenced email that represented, among other things, that Defendants had "no intention of calling the instrument" with the intention that Plaintiffs would rely on these representations.

89.    On November 26, 2019, Mr. Leu sent Mr. Patel the above referenced letter that represented, among other things, that CIG Capital was committed to providing the $95 million in financing and that Suvarna had been approved to proceed to final closing with the intention that

Plaintiffs would rely on these representations.

90.     At the time CIG Capital and Mr. Leu made these material representations, they knew these representations were false or alternatively, made them recklessly without any knowledge of their truth and as positive assertions. Further, these representations were made in bad faith without any present intention to perform and used as a device to perpetrate a fraud.

91.     Plaintiffs relied on these material representations by, among other things, refraining from seeking alternative financing, refraining from seeking to cancel the original LOC in favor of CIG Capital, taking out the second LOC, and refraining from seeking to cancel the second LOC.

92.     As a result of their reliance on the material misrepresentations by Mr. Leu and CIG Capital, Plaintiffs have suffered damages including but not limited to the above referenced $10.25 million (above the $4.5 million advanced), along with additional damages including those detailed in Paragraph 72 above. Given these Defendants acted improperly, intentionally, and with malice, Plaintiffs are also entitled to exemplary damages.

### COUNT III – COMMON LAW AND STATUTORY CONVERSION AGAINST ALL DEFENDANTS

93.     Plaintiffs hereby incorporate each allegation above as if fully set forth herein.

94.     As described more fully above, CIG Capital, Mr. Carey, and Mr. Leu have (a) stolen or converted specifically identifiable funds belonging to Plaintiffs, (i.e., the improper draw of $14.75 million above the $4.5 million "out of pocket" advance), or (b) received, possessed, or aided in the concealment of these stolen or converted specifically identifiable funds.

95.     Although Plaintiffs have demanded the return of these specifically identifiable funds, Defendants have continued to wrongfully exercise dominion and control over this property.

96.     Along with the contractual duty not to draw on the second LOC absent an uncured Payment Default (and only for an amount equal to an "out of pocket loss"), Defendants owed

Plaintiffs a separate legal duty not to convert Plaintiffs' specifically identifiable property. In other words, absent any contractual relationship, Defendants' theft and refusal to return – minimally the $10.25 million excess – funds constituted conversion independent of any contractual relationship.

97.     As a direct and proximate result of the above conversion, Plaintiffs have minimally suffered damages of $10.25 million. Therefore, under MCL 600.2919a, Plaintiffs are entitled to recover three times actual damages (minimal $30.75 million), plus costs and attorney's fees.

### COUNT IV – BREACH OF FIRST SET OF LOAN DOCUMENTS AGAINST CIG CAPITAL (ALTERNATIVE)

98.     Plaintiffs hereby incorporate each allegation above as if fully set forth herein.

99.     Suvarna and Choice Gateway collectively executed the First Loan Agreement, the Collateral Security Agreement, the Interest Pledge Agreement, and the Promissory Note, (i.e., First Set of Loan Documents), with CIG Capital on July 26, 2019, wherein, among other things, (a) CIG Capital agreed to lend Suvarna $95 million and (b) Plaintiffs agreed to provide collateral in the form of a $14.75 million LOC *as security* for the above loan.

100.     CIG Capital breached this contract when it (a) failed to loan Suvarna the promised $95 million for over two and a half years, (b) drew on the second LOC despite admittedly never providing notice of any uncured Payment Default, (c) drew on the second LOC without ever providing Plaintiffs with the requisite Certification (under "penalty of perjury"), and (d) drew well in excess of any conceivable "out of pocket loss."

101.     As a result of these breaches of the First Set of Loan Documents, Plaintiffs have suffered damages, including those detailed in Paragraph 72 above and those associated with the improper draw on the $14.75 million LOC.

### COUNT V – UNJUST ENRICHMENT AGAINST ALL DEFENDANTS (ALTERNATIVE)

102.    Plaintiffs hereby incorporate each allegation above as if fully set forth herein.

103.    After advancing only $4.5 million of a promised $95 million loan, CIG Capital inexplicably drew on the entire $14.75 million LOC issued by Bank of America that was secured by Plaintiffs' cash deposit with Bank of America. Consequently, CIG Capital has received a benefit of at least $10.25 million from Plaintiffs.

104.    It would be inequitable and unjust to allow CIG Capital to retain the approximately $10.25 million difference between the advance and the full Second LOC amount.

105.    Consequently, Plaintiffs are entitled damages of at least $10.25 million.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Honorable Court enter a judgment in their favor against Defendants for all damages sustained, along with treble damages, exemplary damages (fraud), reasonable attorneys' fees, costs, and any other relief that this Court deems appropriate, just and equitable.

Date:  December 28, 2023                              Respectfully submitted,

BROOKS WILKINS SHARKEY & TURCO PLLC

By: /s/ Michael T. Price
Michael T. Price (P57229)
401 S. Old Woodward Ave., Suite 400
Birmingham, Michigan 48009
(248) 971-1800
brooks@bwst-law.com
price@bwst-law.com

DENTONS US LLP

By: /s/ Mark G. Trigg
Mark G. Trigg
Georgia Bar No. 716295
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
mark.trigg@dentons.com

## JURY DEMAND

Plaintiffs pray for a trial by jury of all issues so triable.


Date:  December 28, 2023                    Respectfully submitted,

                                            BROOKS WILKINS SHARKEY & TURCO PLLC

                                            By: *Michael T. Price*
                                            Michael T. Price (P57229)
                                            401 S. Old Woodward Ave., Suite 400
                                            Birmingham, Michigan 48009
                                            (248) 971-1800
                                            brooks@bwst-law.com
                                            price@bwst-law.com


                                            DENTONS US LLP

                                            By:  *Mark G. Trigg*
                                            Mark G. Trigg
                                            Georgia Bar No. 716295
                                            303 Peachtree Street, NE, Suite 5300
                                            Atlanta, Georgia 30308
                                            (404) 527-4000
                                            mark.trigg@dentons.com